**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

CESAR CRUZ, *et al.*,

    **Plaintiffs,**

        **v.**                **Civil No.** 08-1424 (FAB)

BRISTOL MYERS SQUIBB COMPANY
PR, INC., *et al.*,

    **Defendants.**

**OPINION AND ORDER**

BESOSA, District Judge

On January 11, 2011, defendants Bristol Myers Squibb Company PR, Inc., Bristol Myers Squibb MFG., Inc., and BMS Severance Plan (collectively "Bristol Myers") filed a motion for summary judgment. (Docket No. 94.)  On January 23, 2011, plaintiff Cesar Cruz ("Cruz") filed an opposition to defendants' motion.  (Docket No. 110.)  Defendants replied to plaintiff's opposition on February 4, 2011. (Docket No. 125.)  On February 22, 2011, plaintiff filed his reply.  (Docket No. 137.)

**I.  Defendants' Motions to Strike**

On February 1, 2011, defendants Bristol Myers filed a motion to strike three of plaintiff's exhibits to his opposition to defendants' motion for summary judgment.  (Docket No. 124.) Plaintiff Cruz filed a motion in opposition to defendants' motion to strike on February 22, 2011.  (Docket No. 136.)  Defendants

Bristol Myers replied to plaintiff's motion in opposition on March 2, 2011.  (Docket No. 145.)

Defendants also filed a motion to strike plaintiff's untimely announcement of witnesses and second set of interrogatories and request for production of documents on November 19, 2010.  (Docket No. 73.)  Plaintiff opposed the motion and requested declaratory judgment on December 13, 2010.  (Docket No. 76.)  Defendants filed their reply and opposition to plaintiff's motion on December 22, 2010.  (Docket No. 79.)  Plaintiff filed a response on January 5, 2011.  (Docket No. 89.)

The Court first addresses defendants' motion to strike plaintiff's exhibits, then moves on to defendants' motion to strike the announcement of witnesses and second set of interrogatories, as well as plaintiff's motion for declaratory judgment.

Defendants request the Court either to strike or disregard completely three of plaintiff's exhibits to his opposition to defendants' motion for summary judgment.  (Docket No. 124 at 2.) Specifically, defendants allege that two of the exhibits, Disparate Impact Analysis Phase A and Phase B, were not previously disclosed to defendants prior to the discovery deadline set by this Court in its scheduling order for November 9, 2010.  (Docket No. 42 at 8.) Defendants further allege that plaintiff's use of a declaration by Louis Merced-Torres ("Merced") was improper and should be stricken

or disregarded by the Court because it constitutes a sham affidavit.  (Docket No. 124 at 7.)

**A.    Motion to Strike Disparate Impact Analysis Phase A and Phase B**

Defendants ask the Court to strike or disregard plaintiff's exhibits at Docket Nos. 110-6 and 110-7 because they were not properly disclosed to defendants during the discovery process in violation of Rule 26, which mandates parties to disclose, among other things, copies "of all documents . . . [the party] may use to support its claims or defenses, unless the use would be solely for impeachment."  Failure to make appropriate discovery disclosures as required by Rule 26 results in the failing party's inability "to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 36(c)(1).  Defendants also maintain that the documents are unauthenticated and irrelevant.  (Docket No. 124 at 3-4.) Plaintiff does not dispute that the documents were not sent to defendants prior to the discovery deadline, but claims that counsel for plaintiff sent a letter to defendants' counsel, prior to the discovery deadline of November 9, 2010, notifying them that there was a "predicament regarding the payment of an expert and that [they] would be using a model software until the trial." (Docket No. 136 at 6.)  Plaintiff claims that he received no response to this communication, and sent another communication, dated

October 10, 2010, notifying defendants that plaintiff had uncovered information of "reduction in force data" which "casts doubt as to information given . . . by [defendant] and will likely trigger another interrogatory on our part."   (Docket No. 136-3.) Defendants assert that counsel for defendants never received the initial letter, and that the letter is irrelevant, because the duty to authenticate the documents remains with the party moving to admit them as evidence, which plaintiff failed to do.   (Docket No. 145 at 3.)   Plaintiff maintains that the documents will be authenticated by an expert at trial (Docket No. 136 at 6); defendants claim, however, that no expert has ever been disclosed to defendant.   (Docket No. 124 at 4).

Pursuant to Rule 26(a) and the Court's Scheduling Order, filed on February 10, 2010, the parties were under a continuing obligation to complete all discovery by November 9, 2010.   See Docket No. 42 at 8.   Rule 36(c) clearly states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."   Defendants maintain, and plaintiff does not dispute, that plaintiff did not disclose the Disparate Impact Analysis Phase A and Phase B to defendants at any time prior to the discovery deadline, or that any expert report regarding the documents has

been disclosed to defendants.  Thus, plaintiff's exhibits may be used to support his opposition to defendant's motion for summary judgment only if plaintiff's failure to disclose can be deemed "substantially justified" or "harmless."  Fed.R.Civ.P. 36(c).

        Plaintiff's primary argument in favor of using the exhibits in support of his motion is that plaintiff asked defendants whether "using of the program used in Exhibits 4a and 4b . . . was acceptable and received no objection."  (Docket No. 136 at 7.)  Plaintiff further maintains that he was "forced to forego an expert's report because he could not pay for one."  Id. Rule 26(a) is unambiguous in mandating that a party must provide documents in support of its claims or defenses to other parties prior to the discovery deadline.  Fed.R.Civ.P. 26(a)(1)(A)(ii). The rules also require a party to disclose the identity of expert witnesses and submit an expert report, containing, among other things, a summary of the witness's expected testimony.  Id. 26(a)(2).  Plaintiff delayed in providing the documents to defendants until well after the discovery deadline, which was set for November 9, 2010.  (Docket No. 42.)  The first time defendants claimed to have seen the documents, which plaintiff does not dispute, was when plaintiff attached them to his opposition to defendants' motion for summary judgment, on January 23, 2011.  See Docket No. 124. As of this date, plaintiff still has not provided an expert report.  Plaintiff's failure to disclose this information

means that plaintiff is not permitted to use this evidence in support of its motion "unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1). The First Circuit Court of Appeals has held that Rule 37(c), though traditionally used to bar introduction of evidence or expert testimony at trial, "applies with equal force to motions for summary judgment." Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 60 (1st Cir. 2001) (granting defendant's motion to strike and excluding expert's affidavit at summary judgment stage where it was not adequately disclosed by plaintiff during the discovery process.) Plaintiff's failure to disclose the disparate impact analyses and an expert report regarding the analyses during the discovery process prevented defendants from conducting appropriate discovery regarding the analyses and deprived defendants "of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery." Id. (holding that "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate.") Plaintiff fails to provide any justifiable explanation for his failure to produce adequate discovery, and the prejudice to defendant is obvious. Accordingly, defendants' motion to strike the disparate impact analyses is **GRANTED**.

**B.   Motion to Strike Louis Merced's Affidavit**

Defendants next request that the Court strike Exhibit 3 of plaintiff's motion in opposition to defendants' motion for summary judgment, alleging that the exhibit, which is a sworn declaration by Merced, is a sham affidavit.  See Docket No. 110-5.  Merced was deposed on October 28, 2010.  (Docket No. 124-1.)  He testified, among other things, (1) that he was employed as a mechanic, not a lead technician; (2) that plaintiff filed an application for continued work with defendant; and (3) that he lacked knowledge of the requirements to be a corrective maintenance mechanic.  Id.  The affidavit which plaintiff seeks to admit, states, in contravention to Merced's deposition testimony, (1) that Merced worked as a lead technician; (2) that plaintiff was not allowed to file an application for continued work with defendant; and (3) that certain individuals lacked the requirements to be called a mechanic.  (Docket No. 110-5.)  Plaintiff alleges that the affidavit should be admitted because it was created prior to Merced's deposition, it was made part of the record during Merced's deposition, and it "was the basis of defendant's deposition" of Merced.  (Docket No. 136 at 1.)  Defendants point out, however, that the affidavit used during Merced's deposition was a different document than the one plaintiff seeks to introduce into evidence now.  (Docket No. 145.)  While much of the language in the two documents is similar, defendants are correct that the affidavit

used during Merced's deposition is not the same one now offered by
plaintiff.  See Docket Nos. 145-1 and 110-5.  Moreover, the
affidavit used during Merced's deposition was dated 06/07/2010,
while the document being offered into evidence is undated.  Id.

     The First Circuit Court of Appeals has held that issues
of fact may not be created by parties by the submission of a
"subsequent contradictory affidavit."  Morales v. A.C. Orssleff's
EFTF, 246 F.3d 32, 35 (1st Cir. 2001) (citing Colantuoni v. Alfred
Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an
interested witness has given clear answers to unambiguous
questions, he cannot create a conflict and resist summary judgment
with an affidavit that is clearly contradictory, but does not give
a satisfactory explanation of why the testimony is changed.")
Portions of the affidavit plaintiff seeks to introduce contradict
the testimony that Merced gave in his deposition.  Plaintiff
presents a number of confusing and unclear arguments supporting
introduction of the affidavit in his opposition to defendants'
motion to strike.  It appears that plaintiff attempts to reconcile
the affidavit with the deposition testimony by claiming that the
affidavit is merely summarizing or clarifying the deposition
testimony.  There is no explanation given of how the testimony is
different; in fact, plaintiff does not even seem to recognize or
acknowledge this fact.  While Merced's deposition testimony may be
ambiguous in some respects, plaintiff cannot submit an affidavit

that is confusing and contradictory when compared to the witness's deposition testimony.   Plaintiff repeatedly cites to Merced's deposition testimony, supposedly to show that the affidavit does not contradict that testimony.   Merced's deposition testimony was inconsistent in some respects, for example, on the issue of whether Merced was employed as a lead technician or performed the duties of a lead technician.   (Docket No. 124-1 at 2-3.)   Plaintiff's attempt to clarify the deposition testimony through introduction of an affidavit is improper and misguided at best, and constitutes a sham affidavit at worst.   Defendants' motion to strike exhibit 3, Merced's sworn declaration, is **GRANTED**.

### C.   **Motion to Strike Untimely Announcement of Witnesses and Second Set of Interrogatories**

Defendants request that the Court strike plaintiff's untimely announcement of witnesses and second set of interrogatories and request for production of documents.   (Docket No. 73.)   Defendants claim that plaintiff's failure to announce four witnesses before the discovery deadline is in violation of Rule 26.   As mentioned in Part A of this section, Rule 36(c) clearly states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."   Plaintiff's failure to disclose the four witnesses to defendant until November 8, 2010

at 10:51 p.m., less than two hours before the discovery deadline of November 9, 2010, has certainly not been harmless to defendants. Due to plaintiff's delay, defendants were unable to depose any of the witnesses or carry out discovery related to the individuals prior to the discovery deadline.  Therefore, defendants' motion to strike the untimely announcement of plaintiff's witness is **GRANTED.**

Defendants next request the Court to strike plaintiff's second set of interrogatories, which were also served upon defendants on November 8, 2010 at 10:51 p.m., less than two hours before the discovery deadline.  The Court finds this an appropriate place to note the bizarre and nonsensical content of plaintiff's motions, particularly the motion in opposition to strike and request for declaratory judgment.  See Docket No. 76.  Plaintiff fails to cite to any case law, but instead relies on constitutional arguments supported by various references to psychologists, philosophers, song lyrics, puns, and other pop culture analogies. Id.  It is well-settled First Circuit law that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  Plaintiff's second set of interrogatories contained questions that were "reiterations of information I did not receive answers to in the first set of answers to interrogatories" and questions "prompted by the fact that, at least in my opinion, neither Mr. Cotto, nor Mrs. Castro

were entirely response [sic] during their recent deposition."
(Docket No. 79-2.)  Plaintiff also claims that his interrogatory
requests are appropriate because they were technically filed before
the deadline of November 9, 2010.  Plaintiff fails to note,
however, that the Case Management Order expressly states that "all
discovery must be <u>completed</u> on or before November 9, 2010, and that
"[a]ny motion seeking an extension must be filed well in advance of
the deadline."  (Docket No. 42 at 8.)  Defendants are correct in
asserting that plaintiff should have used the mechanisms contained
in the Federal Rules of Civil Procedure and the Local Rules to
resolve discovery disputes or object to incomplete discovery well
before the discovery deadline.  (Docket No. 79 at 6; <u>see</u> <u>also</u>
Fed.R.Civ.P. 37(a); Local Civ.R. 26(b).)  According to the evidence
of communication between counsel produced by defendants and the
arguments set forth by both parties, the Court finds that
plaintiff's second set of interrogatories and request for
production, served upon defendants less than two hours before the
discovery deadline, is improper.  The Court **GRANTS** defendants'
motion to strike the interrogatories.

Finally, the Court turns to plaintiff's motion for declaratory judgment under 42 U.S.C. §§ 1981 and 1982.[1]  The Court agrees with defendants that plaintiff has failed to demonstrate that he is entitled to a declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure.  Like the majority of his opposition to defendants' motion to strike, this argument in plaintiff's motion makes no sense.  The Court declines the opportunity to consider baseless arguments that are unsupported by case law or applicable statutory law.  Plaintiff's motion for declaratory judgment is **DENIED.**

## II.  Motion to Deem Admitted Defendants' Statement of Facts

On January 31, 2011, defendants filed a motion to deem as admitted defendants' statement of uncontested facts in support of its motion for summary judgment.  (Docket No. 120.)  Plaintiff opposed the motion on February 1, 2011.  (Docket No. 123.)

---

[1] 42 U.S.C. § 1981 reads:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1982 reads:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

Defendants allege that plaintiff has failed to comply with Local

Rule 56, which states in part:

> A party opposing a motion for summary judgment shall
> submit with its opposition a separate, short, and concise
> statement of material facts.  The opposing statement
> shall admit, deny or quality the facts supporting the
> motion for summary judgment by reference to each numbered
> paragraph of the moving party's statement of material
> facts.

Local Civ.R. 56(c).

The Court will only consider the facts alleged in the parties'

Local Rule 56 statements when entertaining the movant's arguments.

Rivera v. Telefonica de Puerto Rico, 913 F.Supp. 81, 85

(D.P.R. 1995).  Where the party opposing summary judgment fails to

comply with the rule's requirements, the district court is

permitted to treat the moving party's statement of facts as

uncontested.  See Alsina-Ortiz v. Laboy, 400 F.3d 77, 80 (1st Cir.

2005).  "Parties ignore [such rules] at their peril." Ruiz Rivera

v. Riley, 209 F.3d 24, 28 (1st Cir. 2000).

Plaintiff claims that he has adequately addressed the

defendants' uncontested facts in his own statement, and if the

Court were to find that plaintiff has failed to comply with

Rule 56, the Court should direct defendants to state specifically

which issues plaintiff has failed to address.  (Docket No. 123

at 2.)[2]  The Court does not consider this remedy to be appropriate here.  Plaintiff's statement of uncontested facts clearly fails to "admit, deny, or qualify [defendants'] assertions of fact paragraph by paragraph as required by Local Rule 56(c).  Instead, [plaintiff] submitted an alternate statement of facts in narrative form."  See Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7-8 (1st Cir. 2007).  The First Circuit Court of Appeals, in Philip Morris, has held that "[t]his failing alone [by plaintiff] would have warranted a 'deeming' order" admitting the defendant's statement of uncontested facts.  Id.  Significantly, plaintiff did not intend to accept defendants' statement of facts as true and simply augment them with their own additional facts.  Plaintiff's statement of facts includes an entirely alternate set of facts, many of which contain incorrect citations to the record, in further violation of Local Rule 56(c) and (e).  For the reasons stated, the Court **GRANTS** defendant's motion to deem admitted defendants' statement of facts.

---

[2] Plaintiff cites to Fed.R.Civ.P. 56(e), which provides that:

"[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may:

(1)  give an opportunity to properly support or address the fact;
(2)  consider the fact undisputed for purposes of the motion;
(3)  grant summary judgment if the motion and supporting materials--including    the    facts    considered undisputed--show that the movant is entitled to it; or
(4)  issue any other appropriate order."

## III. Statement of Uncontested Facts

### Background Facts

Bristol Myers is a pharmaceutical company located in Humacao, Puerto Rico.  (Docket No. 94-3 at ¶ 4.)  Plaintiff Cruz began working at Bristol Myers as a temporary employee through an employment company in December, 1991.  (Docket No. 94-4 at 5.) Cruz became a regular employee in September, 1993.  (Docket Nos. 94-4 at 5; 94-8 at 9.)  Cruz was terminated from his employment in August, 2007.  (Docket No. 94-4 at 11.)  At the time of his termination, Cruz held the position of Corrective Maintenance Mechanic.  (Docket No. 94-4 at 6-7.)  Cruz was born on May 17, 1965.  (Docket Nos. 94-4 at 2; 94-8 at 9.)  He was 42 years old when terminated.

### Facts Related to the Closing of Bulk Operations in Humacao

On or around 2003, Bristol Myers made the decision to close the Bulk Operations in the Humacao site.  (Docket No. 94-3 at ¶ 6.) The closing process entailed a corporate reorganization that spanned several years.  (Docket No. 94-3 at ¶ 7.)  As part of the closing process, Bristol Myers adopted a voluntary Retention Bonus Program designed to retain key resources and assure compliance until the closure of operations; only those employees selected by senior management were eligible to participate in the program. (Docket No. 94-3 at ¶ 8.)  On July 29, 2003, Bristol Myers sent Cruz a letter informing him that he had been selected to

participate in the company's Retention Bonus Program. (Docket No. 94-5.) Under this program, Cruz became eligible for a one-time cash payment, payable 30 days after his required service with the company had concluded. Id. The cash bonus was in addition to any severance package that Cruz may have been eligible for at the time of his termination. Id. According to the letter sent to Cruz, the cash bonus was to be managed in three phases: (1) Phase I - those selected employees impacted when completion of Building 5 process was transferred or completed would receive three months (25%) of their annual salary; (2) Phase II - those selected employees impacted when completion of Buildings 2 and 29 process was transferred or completed would receive six months (50%) of their annual salary; and (3) Phase III - those selected employees impacted when completion of Buildings 3 and 5 Sterile processes was transferred or completed would receive nine months (75%) of their annual salary. Id. The amount of bonus to be paid to a particular employee depended on the timing of the employee's termination and not the building in which the employee worked. (Docket No. 94-3 at ¶ 10.) Neither the July, 29, 2003 letter sent to Cruz nor the Retention Bonus Program description included in the letter contained a promise of continued employment in a particular building or until a specified date or time. (Docket No. 94-5.)

### Facts Related to the Paired Comparison Analysis

As part of the process of selecting the employees who would be terminated, Bristol Myers first decided which positions would be affected, and then carried out a paired comparison analysis of critical skills of the employees in the affected positions.  Id. at ¶ 12.  The company ranked the employees according to the results of the paired comparison analysis, and retained those employees with the top rankings, while terminating those with the lowest rankings.  Id.  At the time of Cruz's termination in August 2007, his position of Corrective Maintenance Mechanic was one of those chosen to be affected, and therefore, Bristol Myers decided that two Corrective Maintenance Mechanics would be selected for termination.  Id. at ¶ 13.  There were four Corrective Maintenance Mechanics at that time:  plaintiff Cesar Cruz, Merced, Pedro Cruz, and Daniel Fontanez ("Fontanez").  (Docket Nos. 94-3 at ¶ 14; 94-6 at ¶ 5; 94-7 at ¶ 5; 94-11.)  To determine which two mechanics would be selected for termination, and pursuant to Bristol Myers practices, the company carried out a paired comparison analysis of the four corrective maintenance mechanics and selected the employees considered best to embody the skills needed to continue the remaining operations.  (Docket No. 94-3 at ¶ 17.)  Pursuant to company policy, in the event that two or more employees fell within the same performance category, the employee's seniority would be considered the tie-breaker in the decision.  Id. at ¶ 18.  Fontanez

began working at Bristol Myers on June 11, 1984 and was born on July 21, 1957.  (Docket No. 94-8 at 9.)  Pedro Cruz began working at Bristol Myers on October 8, 1984 and was born on March 2, 1964. Id.  Merced began working with Bristol Myers on April 8, 1991 and was born on January 7, 1959.  Id.

The three raters who carried out the paired comparison analysis were: (1) Armando Marina ("Marina"), Director of Facilities; (2) Luis Cotto ("Cotto"), Maintenance Services Manager, Manufacturing Support and the Corrective Maintenance Mechanics' supervisor; and (3) Juan Ramon Ortiz ("Ortiz"), Facilities Department supervisor. (Dockets Nos. 94-3 at ¶ 20; 94-7 at ¶¶ 4-5; 94-6 at ¶¶ 4-5; 94-10 at 2-3; 94-11.)  Each rater performed an independent analysis of the Corrective Maintenance Mechanics based upon six criteria, and then sent Grisel Castro ("Castro"), the company's Director of Human Resources, their individual results. (Docket Nos. 94-3 at ¶¶ 20-21; 94-7 at ¶¶ 6-7; 94-6 at ¶¶ 6-7; 94-10 at 2-4.)  The six criteria were:  (1) coordinates with all business partners to provide preventive and corrective maintenance to plant equipment in compliance with applicable operational procedure requirements; (2) maintains in good condition all tools and equipments in his/her responsibility as demonstrated by following the Corrective Maintenance Program; (3) effectively and timely determines and corrects equipment malfunctions demonstrated by timely completion of work force; (4) conducts inspections

periodically in accordance with established procedures;
(5) effectively carries out daily work by compliance with
appropriate procedures and documentation in accordance with cGMP,
SOP's and safety regulations as applicable; and (6) demonstrates
all Core BMS Behaviors.  (Docket Nos. 94-11; 94-8 at 3; 94-6
at ¶ 7; 94-7 at ¶ 7.)

Castro was in charge of tallying the results of the analysis
and identifying the employees to be terminated, based on the
results.  (Docket No. 94-3 at ¶ 21.)  Based on the results of the
analysis, the employees were given a rating number and ranked 1
through 4, with 1 being the highest scoring employee and 4 the
lowest scoring.  Id. at ¶ 22.  The highest scoring employee was
Pedro Cruz (ranked 1), followed by Fontanez (ranked 2), followed by
Cesar Cruz (ranked 3), and followed by Merced (ranked 4).  (Docket
No. 94-3 at ¶ 23; see also Docket No. 94-3 at 10.)  The employees
were then divided into three "post-rating ranks" or categories:
Pedro Cruz was in Rank 1, Fontanez and Cesar Cruz were in Rank 2,
and Merced was in Rank 3.  (Docket No. 94-3 at ¶ 24, see also
Docket No. 94-3 at 11.)  Merced, the lowest ranking employee, was
selected for termination.  (Docket No. 94-3 at ¶ 26.)  Because
there was another person to be selected for termination, and
Fontanez and Cesar Cruz were both in Rank 2, the company used
seniority as the "tie-breaker" and chose the less senior employee,
Cesar Cruz, for termination.  Id. at ¶ 27; see also Docket No. 94-8

at 3-4, 9.  As of August 2007, Cesar Cruz was the least senior of the four employees who occupied the position of Corrective Maintenance Mechanic.  (Docket No. 94-8 at 3-4, 9.)

During the summer of 2007, Bristol Myers began the process of permanently closing Building 2 in the Humacao site.  (Docket No. 94-3 at ¶ 11.)  On June 22, 2007, Bristol Myers sent Cesar Cruz a letter in compliance with the Workers Adjustment and Retraining Act of 1988 ("WARN") notifying him that there would be a permanent closing of the plant that would result in termination of his employment on August 29, 2007.  (Docket No. 132-3.)  Cruz was selected for termination during Phase II of the Bonus Retention Program.  (Docket Nos. 94-3 at ¶ 29; 94-5 at 2.)  At the time of Cruz's termination, the closing of Buildings 3 and 5 Sterile was not yet completed.  (Docket Nos. 94-4 at 28-31; 94-9 at 31.)  In September, 2007, Cruz was paid a bonus of $19,823.50, equivalent to 50% of his annual salary.  (Docket No. 94-3 at ¶ 31; see also 94-3 at 12.  No one was hired to replace Cruz.  (Docket Nos. 94-3 at ¶ 32; 94-10 at 5.)

**Facts Related to the Severance Plan**

Bristol Myers adopted a Severance Plan, governed by the Employee Retirement Income and Security Act ("ERISA"), effective January, 2006, in order to provide eligible employees who were involuntarily terminated from their employment with economic and other benefits to assist them during the period following

termination.   (Docket Nos. 132-4; 94-3 at ¶ 33.)   On April 18, 2006, Cruz attended a meeting where the Severance Plan was discussed and he received a copy of the Severance Plan's Summary Plan Description ("SPD").  (Docket Nos. 94-14; 94-15; 132-5; 132-6; 94-4 at 14-15.)   The SPD expressly stated that, in order to be eligible to receive severance under the plan, a General Release had to be signed and returned within the time period required by the employer.  (Docket No. 132-4 at 5.)   The Severance Plan and the SPD contained detailed information as to a participant's right to file an appeal if denied severance benefits within 60 days after termination, as well as the name and address of the Plan Administrator to whom such appeal had to be addressed.  (Docket Nos. 132-4 at 13-18; 94-18.)   The Severance Plan also detailed a participant's right to subsequent appeals, and noted the requirement to exhaust all internal administrative remedies before filing a lawsuit to recover benefits.  Id.

On August 17, 2007, Bristol Myers sent Cruz a letter confirming his termination effective August 31, 2007, including information and documents related to the termination, such as a summary of the severance payment to which plaintiff was entitled if he fulfilled certain requirements, which included the execution of a General Release.  (Docket No. 312-7.)   The letter also included a copy of the General Release to be signed and returned by plaintiff, as well as information noting that, under the company's

Severance Plan, plaintiff would have been eligible for a payment of $47,833. Id. Plaintiff was informed that he would have 45 days to review and return the executed General Release. Id. at 5. Plaintiff signed an acknowledgment of receipt, certifying that he had received all the documents mentioned in the August 17, 2007 letter regarding the termination of his employment. (Docket No. 132-8.) On September 14, 2007, Bristol Myers sent Cruz a letter reminding him that the 45 days he had to return the executed General Release, in order to obtain benefits, would expire on September 30, 2007. (Docket No. 132-1 at 25.) Plaintiff did not return the executed General Release. (Docket No. 94-3 at ¶ 36.) The Plan Administrator did not receive any administrative claim or appeal from Cruz, as required under the terms of the Severance Plan, to claim unpaid benefits under the Plan. (Docket No. 94-18.)

### Facts Related to Plaintiff's Application for a New Position

On or around July, 2007, plaintiff submitted a job bid for the position of Pharmaceutical Packaging Maintenance Mechanic. (Docket No. 94-3 at ¶ 37.) The position required an associate degree in Electronics or Instrumentation Technology with exposition to Mechanical environment, Industrial Mechanics Technology, or a Tool & Die Degree. (Docket No. 132-1 at ¶ 38; see also Docket No. 132-1 at 26.) Cruz's educational background consisted of a high school diploma, a degree in diesel mechanics from Polytechnic University, and vocational studies in welding and management at the

Interamerican University and University of Turabo in Caguas. (Docket No. 94-4 at 3-4.)   Cruz did not meet the explicit requirements of the position and was therefore not chosen for it. (Docket No. 94-3 at ¶ 39.)

## IV.  Defendants' Motion for Summary Judgment

### A.   Summary Judgment Standard

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  The Rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); see also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52.  (1st Cir. 2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment.  For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to

Civil No. 08-1424 (FAB)                                           24

specific facts that demonstrate the existence of an authentic dispute.  See Suarez v. Pueblo Int'l., Inc., 229 F.3d 49, 53 (1st Cir. 2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine."  Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment.  Id. at 252.  It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion."  Maldonado-Denis v. Castillo-Rodriquez, 23 F.3d 576, 581 (1st Cir. 1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

**B.    Plaintiff's Claims Under ERISA**

Plaintiff asserts the following claims under ERISA: (1) defendants failed to provide benefits under the Severance Plan pursuant to 29 U.S.C. § 1132(a)(1); (2) defendants' actions are a breach of fiduciary duty pursuant to 29 U.S.C. § 1132(a)(3); and (3) defendants' actions interfered with plaintiff's protected rights pursuant to 29 U.S.C. § 1140.  Defendants' initial argument is that plaintiff lacks a cause of action under ERISA because he failed to exhaust administrative remedies before bringing suit in federal court.  (Docket No. 95 at 4-6.)  To rebut this argument, plaintiff claims that the Severance Plan is not a bona fide ERISA plan.[3]  (Docket No. 137 at 6.)  Plaintiff provides no evidence in the record of this claim, nor does he provide the Court with any legal support for the argument that exhaustion of remedies is not applicable in this case.  Conclusory allegations and unsupported speculation such as those presented by plaintiff will be ignored by the Court.  See Medina-Muñoz, 896 F.2d at 8 (1st Cir. 1990). Defendants have, however, provided the Court with evidence

---

[3]  In support of this proposition and the majority of plaintiff's other arguments in plaintiff's brief, plaintiff cites to Orsini v. Sec. de Hacienda, 2009 TSPR 190 (2009).  This case was before the Supreme Court of Puerto Rico and was provided to the Court in Spanish, without an English translation.  It is well-settled First Circuit law that a party relying on a decision written in a foreign language "must provide the district court with and put into the record an English translation of the decision." Puerto Ricans for Puerto Rico Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008).  Where the party has failed to do so, as is the case here, the Court may not consider the documents.

supporting its claim that the Severance Plan at issue is in fact an ERISA plan.  (Document No. 132-4 at 13.)

        The First Circuit Court of Appeals has held that, as a general matter, a plaintiff seeking to recover benefits or enforce rights under an ERISA plan must exhaust available administrative remedies under their ERISA-governed plans before they bring suit in federal court.  Drinkwater v. Metropolitan Life Ins. Co., 846 F.2d 821, 825-826 (1st Cir. 1988) (holding that a former employee seeking disability benefits was required to exhaust administrative remedies under the plan in the absence of evidence that the plan's review procedure would have been futile or inadequate); see also Medina v. Metropolitan Life Ins. Co., 588 F.3d 41, 47 (1st Cir. 2009) (affirming district court's finding that plaintiff failed to exhaust all administrative remedies that the fiduciary provides because he never submitted a benefits claim for evaluation and adjudication.)

        The Severance Plan's SPD, which plaintiff does not dispute that he received, expressly details information regarding a participant's right to file an appeal if denied severance benefits within 60 days after termination, as well as the name and address of the Plan Administrator to whom such appeal had to be addressed.  (Docket Nos. 132-4 at 13-18; 94-18.)  The Plan Administrator testified under penalty of perjury that he did not receive any administrative appeal from plaintiff, and plaintiff

does not argue otherwise.  See Docket No. 94-18 at 2.  Plaintiff's
failure to exhaust, or even attempt to navigate through, the
administrative remedies afforded by Bristol Myers through its
Severance Plan results in his failure to state a cause of action
under ERISA.[4]  Defendants' motion for summary judgment on
plaintiff's ERISA claims is **GRANTED.**

_____

[4] Plaintiff's cause of action for a breach of fiduciary duty
pursuant to 29 U.S.C. § 1132(a)(3) fails here, because, as
defendants point out, "[f]iduciary liability claims under ERISA,
however, are not intended to vindicate *individual* benefit rights,
but rather should be used as instruments to obtain *plan-wide*
relief." (Docket No. 95 at 6-7.)  Significantly, the First Circuit
Court of Appeals has held that "federal courts have uniformly
concluded that, if a plaintiff can pursue benefits under the plan
pursuant to Section a(1), there is an adequate remedy under the
plan which bars a further remedy under Section a(3)."  See LaRocca v.
Borden, Inc., 276 F.3d 22, 28-29 (1st Cir. 2002).

Similarly, plaintiff's cause of action for interference with
protected rights under ERISA pursuant to 29 U.S.C. § 1140 also
fails because plaintiff cannot make a *prima facie* showing that he
was entitled to ERISA protection because he voluntarily chose not
to sign the General Release, which was a requirement to become
eligible to receive a payment under the Severance Plan.  See
Barbour v. Dynamics Research Corp., 63 F.3d 32, 38 (1st Cir. 1995)
("[P]laintiff must show that he or she (1) is entitled to ERISA's
protection, (2) was qualified for the position, and (3) was
discharged under circumstances that give rise to an inference of
discrimination."); see also Pendleton v. QuikTrip Corp., 567 F.3d
988, 992 (8th Cir. 2009) (upholding district court's determination
that plaintiff "did not make a prima facie case because he was not
entitled to any benefits under the plain language of the severance
plan.")

**C.   Plaintiff's Claim for Discrimination under the ADEA/Act 100**

Plaintiff alleges that he was discriminated against on the basis of his age by Bristol Myers under both the Age Discrimination in Employment Act ("ADEA") and Puerto Rico Law 100.

**1.   Disparate Treatment**

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a).  Under federal law, an employee has the burden of proving "that he would not have been fired but for his age." Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 10-11 (1st Cir. 2007) (internal citations omitted).

Because plaintiff has presented no direct evidence of discrimination, the Court proceeds under the McDonnell Douglass burden-shifting regime.  See id.  Under this regime, plaintiff must establish a *prima facie* claim of discrimination by establishing the following:  "(1) he was at least 40 years old; (2) he met the employer's legitimate job performance expectations; (3) he experienced an adverse employment action; and (4) the employer had a continuing need for the services provided previously by the plaintiff." Id.  Once plaintiff has made a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision.

Id. (internal citations omitted). If proven, "the final burden of persuasion rests with the employee to show, by a preponderance of the evidence, that the reason offered by the employer is merely a pretext and the real motivation for the adverse job action was age discrimination." Id.

        Defendants do not dispute that plaintiff meets the first three factors. Defendants argue, however, that plaintiff fails to establish a *prima facie* case of discrimination because he cannot establish the fourth prong of the test. (Docket No. 125 at 3.) Where the adverse employment action is based on reductions in work force, as in this case, a plaintiff must show that the employer "did not treat age neutrally *or* it retained younger persons in the same position." Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995). Cruz was discharged as part of a reduction in force, where two of the four Corrective Maintenance Mechanics were terminated from employment, and no one was hired to replace him. (Docket Nos. 94-3 at ¶ 32; 94-10 at 5.) Furthermore, the two Corrective Maintenance Mechanics who were retained in the position were both older than plaintiff: plaintiff was forty-two at the time of termination, while Pedro Cruz and Daniel Fontanez, who were retained in the position, were forty-three and fifty years old, respectively. (Docket No. 95 at 13.) Plaintiff alleges that Bristol Myers' classification of the four employees that were evaluated in this decision is erroneous - specifically that the

individuals who retained employment were not Corrective Maintenance Mechanics, but welders.  (Docket No. 137 at 13-14.)  The Court refuses to interfere with the rationality or merits of the employer's nondiscriminatory business decisions, including the occupational classification of its employees.  See Fennell v. First Step Designs, Ltd., 83 F.3d 526, 537 (1st Cir. 1996) ("Courts may not sit as super personnel departments, assessing the merits-or even the rationality-of employers' nondiscriminatory business decisions.") (internal citations omitted).  Because plaintiff has failed to produce "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion", he thus fails to establish the fourth element needed to make out a *prima facie* case of age discrimination.  Rivera-Aponte v. Restaurant Metropol #3, Inc., 338 F.3d 9, 11 (1st Cir. 2003) (citing O'Conner v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996)).  Accordingly, defendants' motion for summary judgment on plaintiff's disparate treatment claims under the ADEA is **GRANTED.**

## 2.   Disparate Impact

Plaintiff also alleges a disparate impact claim under the ADEA, claiming that defendants' employment practices fall more harshly upon people in the affected age group (here, people over 40 years old).  (Docket No. 57 at 10.)  Disparate impact claims involve "employment practices that are facially neutral in the treatment of different groups but that in fact fall more

harshly on one group than another.  Teamsters v. United States,
431 U.S. 324, 335-36, n. 15 (1977).  The Supreme Court has held
that "the scope of disparate-impact liability under ADEA is
narrower than under Title VII." Smith v. City of Jackson, 544 U.S.
228, 240 (2005).  In order to present a viable disparate impact
claim, a plaintiff must specify the employment practice being
challenged.  See id. ("[I]t is not enough to simply allege that
there is a disparate impact on workers, or point to a generalized
policy that leads to such an impact. Rather, the employee is
'responsible for isolating and identifying the specific employment
practices that are allegedly responsible for any observed
statistical disparities[sic].'") (internal citations omitted).
Plaintiff has failed to identify the specific practice being
challenged, and simply alleges that defendant engaged in
"subterfuge" and "manipulated the transfer of employees among
production facilities." (Docket No. 57 at 10.) Moreover, it is
clear from the record that defendants' paired comparison analysis,
used to determine which employees would be terminated, "was based

on reasonable factors other than age."[5]  Smith, 544 U.S. at 241.

Pursuant to company policy, an employee's seniority would be

considered as the tie-breaker in the decision in the event that two

or more employees fell within the same performance category.

(Docket No. 94-3 at ¶ 18); see also Smith, 544 U.S. at 242

("Reliance on seniority and rank is unquestionably reasonable . .

.".)  Plaintiff has provided no evidence that age was in any way

considered as a factor in Bristol Myers' decision making process

(and the evidence on the record is to the contrary), or that

defendants' chosen practice was unreasonable. See Smith, 544 U.S.

at 243 ("Unlike the business necessity test, which asks whether

there are other ways for the employer to achieve its goals that do

not result in a disparate impact on a protected class, the

reasonableness inquiry includes no such requirement.")  Thus,

---

[5]  Defendant used three independent raters to evaluate
plaintiff and the other Corrective Maintenance Mechanics based on
the following six criteria: (1) coordinates with all business
partners to provide preventive and corrective maintenance to plant
equipment in compliance with applicable operational procedure
requirements; (2) maintains in good condition all tools and
equipments in his/her responsibility as demonstrated by following
the Corrective Maintenance Program; (3) effectively and timely
determines and corrects equipment malfunctions demonstrated by
timely completion of work force; (4) conducts inspections
periodically in accordance with established procedures; (5)
effectively carries out daily work by compliance with appropriate
procedures and documentation in accordance with cGMP, SOP's and
safety regulations as applicable; and (6) demonstrates all Core BMS
Behaviors.  (Docket Nos. 94-11; 94-8 at 3; 94-6 at ¶ 7; 94-7
at ¶ 7.)

defendants' motion for summary judgment on plaintiff's disparate impact claims is **GRANTED.**

>    3.    **Law 100**

>         In order to make a *prima facie* case under Law 100, plaintiff must meet the undemanding burden of "(1) demonstrating that he was actually or constructively discharged, and (2) alleging that the decision was discriminatory." Velazquez-Fernandez, 476 F.3d at 11.  Once plaintiff meets this burden, the burden shifts to the employer to show, by a preponderance of the evidence, that it had just cause for its employment action.  See id.  As Law 100 does not define the term "just cause", courts have looked to the term's definition in Puerto Rico Law 80.  Varela Teron v. Banco Santander de Puerto Rico, 257 F.Supp.2d 454, 464 (D.P.R. 2003).

>         Law 80 considers the following to be among the reasons constituting just cause for discharging an employee: "[f]ull, temporarily[sic] or partial closing of the operations of the establishment"; "[t]echnological or reorganization changes as well as changes of style, design or the nature of the product made or handled by the establishment, and changes in the services rendered to the public"; and "[r]eductions in employment made necessary by a reduction in the anticipated or prevailing volume of production, sales or profits at the time of the discharge."  Id. (citing P.R. Laws Ann. tit. 29 § 185b(d), (e),(f)).  Law 80 also provides that in cases of discharge under these sections, the

employer should follow the principle of seniority within each occupational classification.  P.R. Laws Ann. tit. 29 § 185c.  In cases where there is a clear and conclusive difference in favor of the efficiency or capacity of the workers compared, however, Law 80 maintains that these efficiency or capacity factors shall prevail in the decision.  See id.

Bristol Myers has shown that it had just cause to terminate plaintiff, for it is undisputed that plaintiff's termination was a result of Bristol Myers' decision to close its Bulk Operations at the Humacao site, a process which entailed a corporate reorganization that spanned several years.  (Docket No. 94-3 at ¶¶ 6-7.)  Defendants chose to carry out a paired comparison analysis of all four Comparative Maintenance Mechanics in order to determine which employees were most efficient and capable to continue operations of the company.  Id. at ¶¶ 12-14, 17; see also Docket Nos. 94-6 at ¶ 5; 94-7 at ¶ 5; 94-11.  The results of the analysis dictated that plaintiff and Merced were the two lowest ranking employees, and were therefore chosen for termination.  (Docket No. 94-3 at ¶ 23; see also Docket No. 94-3 at 10.)  If, on the other hand, defendants had simply followed the principle of seniority, plaintiff and Merced would still have been selected as having the lowest seniority of the four Comparative Maintenance Mechanics compared.  (Docket No. 94-8 at 9.)  Thus, regardless of how the case is analyzed, Bristol Myers has complied

with the requirements of Law 80 to show just cause for its employment action.

Once an employer has met its burden of showing just cause, the burden of persuasion returns to the employee to show "that the employer's decision was motivated by age discrimination." Velazquez-Fernandez, 476 F.3d at 11.  This means that the plaintiff is faced with the same burden of persuasion necessary to bring suit under the ADEA, which plaintiff has failed to meet.  Therefore, defendants' motion for summary judgment on plaintiff's Law 100 claim is **GRANTED.**

**D.    Plaintiff's Claim under Act 80**

As discussed above with respect to plaintiff's Law 100 claim, Bristol Myers has proven that Cruz's discharge was with just cause, as required under Law 80.  P.R. Laws Ann. tit. 29 § 185b. Plaintiff was terminated as a result of a corporate reorganization, which involved the closing, completed in phases, of the Bulk Operations in Humacao.  The company has followed the principle of seniority required under Law 80, because, as previously discussed, plaintiff was the least senior employee out of the four individuals in the occupational classification of Corrective Maintenance Mechanic.  Therefore, the defendants' motion for summary judgment dismissing plaintiff's Law 80 claim is **GRANTED.**

### E.   Plaintiff's Claims for Breach of Contract

Plaintiff's final cause of action is for breach of contract.   Specifically, plaintiff alleges that Bristol Myers breached a contract with plaintiff that stated that "he would be part of the last group of employees to leave the company." (Docket No. 57 at 8.)  The Court is not exactly clear as to what "contract" plaintiff is referring.  Plaintiff must be referring to the letter sent by Bristol Myers to plaintiff on July 29,2003, notifying him of his selection to participate in the Retention Bonus Program, under which plaintiff was eligible for a one-time cash payment after completing his required service with the Company.  (Docket No. 94-5.)

The first question the Court must address is whether a valid contract did in fact exist between the parties.  Plaintiff asks the Court to infer the existence of a contract of adhesion, but cites no applicable legal or factual support for this claim. The Court notes again that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  Zannino, 895 F.2d at 17 (1st Cir. 1990). Under Puerto Rico law, an essential element of a contract is the consent of the contracting parties to be bound by it.  See Marrero-Garcia v. Irizarry, 33 F.3d 117, 122 (1st Cir. 1994); see also P.R. Laws Ann. tit. 31, 3401 (consent is shown "by the concurrence of the offer and acceptance of the thing and the cause

which are to constitute the contract.")  Additionally, there must be a "meeting of the minds as to the terms agreed upon." K-Mart Corp. v. Davis, 756 F.Supp. 62, 66 (D.P.R. 1991) (finding that the parties did not reach a final contract because the text of the agreement evidenced the defendant's intent not to be bound until the parties had finalized negotiations); see also Soc. de Gananciales v. Velez & Asoc., 145 D.P.R. 508, 517 (1998) (holding that a valid contract requires "a meeting of minds that gave rise to an obligation, situation, or state of law resulting from an agreement, and that created certain expectations on the basis of which the parties acted").  Thus, an offer standing alone does not establish the presence of a binding contract. See Marrero-Garcia, 33 F.3d at 122 (internal citations omitted).  Rather, in order to have a valid contract, acceptance must be made of the offer. Id.

The letter notifying plaintiff of the company's Retention Bonus Program cannot be considered a valid contract, primarily because the letter merely informed plaintiff that he was eligible for a one-time cash payment, the receipt of which was contingent upon plaintiff performing certain acts.  (Docket No. 94-5 at 2). Thus, the letter, at best, may be considered an offer.  Moreover, the letter informed plaintiff that he would be eligible for a cash payment, the amount of which was contingent on the timing of the

phase in which plaintiff was selected for termination.[6]  (Docket No. 94-5 at 2.)  Notably, the letter is void of any promise of plaintiff's continued employment in a particular building or until a specified date or time.  Id.  Thus, plaintiff's argument that because he worked in Building 5, he should have been terminated during Phase III and received 75% of his annual salary is without merit.  Because plaintiff was selected for termination during Phase II of the Retention Bonus Program, he was awarded a bonus that was 50% of his annual salary, in full compliance with the terms of the letter sent to plaintiff.  (Docket Nos. 94-5 at 2; 132-3; 94-3 at ¶ 29; 94-3 at 12.)  Thus, even if some agreement between the parties could be inferred from the letter sent to plaintiff by the company, defendant has fully complied with the express terms of the letter.  The Court finds that there was no valid contract between the parties, and **GRANTS** defendants' motion for summary judgment on the breach of contract claim.

---

[6]  The letter provided that the cash bonus was to be managed in three phases:  (1) Phase I - those selected employees impacted when completion of the Building 5 process was transferred or completed would receive three months (25%) of their annual salary; (2) Phase II - those selected employees impacted when completion of the Buildings 2 and 29 process was transferred or completed would receive six months (50%) of their annual salary; and (3) Phase III - those selected employees impacted when completion of the Buildings 3 and 5 Sterile processes was transferred or completed would receive nine months (75%) of their annual salary.  (Docket No. 94-5.)

Civil No. 08-1424 (FAB)                                                    39

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendants' motion

for summary judgment.

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, April 15, 2011.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE